# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

JEFFREY R. SCHWINDT,                          )
                                              )
                     Plaintiff,               )
                                              )
vs.                                           )
                                              )        Ct. No.
MICHAEL E. MILLER and                         )
JOSEPH L. MARK,                               )   **1 : 11 -cv- 0 1 1 0 JMS -MJD**
                                              )
                     Defendants               )        JURY TRIAL DEMANDED

## COMPLAINT FOR DAMAGES AND OTHER RELIEF

Plaintiff, JEFFREY R. SCHWINDT (Schwindt), for his Complaint for Damages and other Relief against Defendants MICHAEL E. MILLER (Miller) and JOSEPH L. MARK (Mark) alleges as follows:

### NATURE OF THE CASE

1.      Miller and Mark took Schwindt's inventions, work, property or intellectual property as their own, transferred or assigned the work and property and were ultimately paid substantial amounts of money that wasn't shared or given to Schwindt in recognition of his Inventions.[1]

2.      The Inventions relate to medical devices used for tissue extraction or biopsy.

3.      Schwindt is an engineer, business owner, investor and inventor. Miller and Mark are also business owners, investors and inventors.

4.      Miller and Mark were founders and controlling owners or shareholders (either personally or through various agreements) of a company called Suros Surgical Systems, Inc.

---

[1] For ease of reference in the remainder of the Complaint, inventions, work, property or intellectual property are all collectively called Inventions.

(Suros). Schwindt was a minority investor in Suros and worked on the Inventions with Miller and Mark.

5.      Among other things, Schwindt made significant inventorship contributions to medical devices that Miller and Mark sold through Suros. Miller and Mark took Schwindt's Inventions as their own and ultimately sold their collective interests to a company called Hologic for a total amount in excess of $200 million. Miller and Mark kept the proceeds for themselves and hid or misrepresented Schwindt's role and ownership of the Inventions. Miller and Mark cut Schwindt out of any recognition and took millions of dollars of revenue to which he is entitled as one of the primary inventors.

6.      At all material times, Miller and Mark owed fiduciary, contractual, statutory and other legal duties to Schwindt. Through a scheme involving threats, disparagement, fraud, deceit, misrepresentation, false oaths, unjust enrichment, deceptive business practices and other misconduct, Miller and Mark violated their duties to Schwindt by taking his Inventions for themselves.

7.      The pattern of conduct continues to date through false statements and misrepresentations about ownership to the United States Patent Office, shareholders and other business colleagues.

8.      Schwindt seeks a declaratory judgment that he is a joint inventor and joint owner of Defendants' patents that are derived from Schwindt's contributions. Defendants' conduct also forms the basis for claims of fraud, deceit, misrepresentation, deceptive business practices and unjust enrichment. Schwindt also requests a full accounting of Defendants' monetary gain from their wrongdoing. Schwindt suffered substantial damages in an amount believed to be in excess

2

of $10,000,000 (ten million dollars). Defendants' conduct is of a nature that warrants a statutory multiplier.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1338 (a) as a civil action related to patents or patent inventorship and pursuant to 28 U.S.C. § 2201 requesting a declaratory judgment.

10.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this is a civil action arising under the laws of the United States.

11.     As an alternative and to the extent it is necessary, Plaintiff also requests that the Court exercise supplemental jurisdiction over related claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 28 U.S.C. § 1400 because both Defendants reside, do business and are subject to personal jurisdiction in the district.

13.     Venue for supplemental claims is appropriate pursuant to 28 U.S.C. § 1391 because this is the judicial district in which both Defendants reside, or is the district in which the events occurred and the subject property is located within the district.

## THE PARTIES AND OTHER ENTITIES

14.     Plaintiff Jeffrey Schwindt is an individual residing in Marion County, Indiana. Schwindt is also an engineer, inventor, founder and president of Air Systems Engineering, Inc. ("ASE"), located in Indianapolis, Indiana. Schwindt currently does business as AIRFX Technologies, LLC and AIRFX, LLC.

15.     Defendant Michael Miller is an individual residing in Johnson County, Indiana. At all relevant times, Miller is or was an owner, investor, shareholder or officer of Suros Surgical

Systems, Inc., a corporation located in Indianapolis, Indiana. Miller is engaged in interstate commerce.

16.     Miller is or was an owner, investor, member, shareholder, or officer of Promex Technologies that operates under assumed names such as Promex, Promex LLC, US Biopsy and Promex/US Biopsy (all collectively called "Promex"). Promex is located in Franklin, Indiana.

17.     Defendant Joseph Mark is a person that resides in Johnson County, Indiana. Mark is or was at all relevant times an owner, investor, shareholder and officer of Suros Surgical Systems, Inc. Mark is engaged in interstate commerce.

18.     Mark is or was also an owner, investor, member, shareholder, or officer of Promex.

19.     Suros Surgical Systems, Inc. ("Suros") is a Delaware corporation with its principal place of business at 6100 Technology Center Drive, Indianapolis, Indiana. Suros is a medical device manufacturer of technologies for systems in minimally invasive biopsy and tissue removal. Suros is a subsidiary of Hologic, Inc. Suros is engaged in interstate commerce.

20.     Hologic, Inc. is a Delaware corporation with its principal place of business in Bedford, Massachusetts. It is a developer, manufacturer and supplier of diagnostic and medical imaging systems primarily dedicated to serving the healthcare needs of women. Hologic is engaged in interstate commerce.

### ALLEGATIONS COMMON TO ALL COUNTS

21.     Schwindt is a named inventor on United States patents and applications. He has substantial experience in the design and use of pneumatic circuits, pneumatic motors and related components. Schwindt should be named as a joint inventor on additional applications or patents. His joint inventorship affects at least the following applications or patents:

4

Application No. 09/707,022 filed November 6, 2000, now Patent No. 6,758,824.

22.    In early 2000, Schwindt was contacted by one of ASE's suppliers. The supplier suggested a meeting with certain individuals at Promex regarding development of a new surgical cutting device. The purpose of the meeting was to explore using Schwindt's expertise in the area of pneumatic circuitry and motors to assist in the device development.

23.    In 2000, Schwindt subsequently met with Joseph Mark, then a vice president of Promex, at the Promex facility in Franklin, Indiana. Mark had Schwindt sign a confidentiality or non-disclosure agreement to ostensibly keep the exchange of information mutually confidential. Concepts were discussed about devices then on the market relating to breast biopsy procedures. Mark verbally disclosed a handheld biopsy device Promex was considering (the "Device").

24.    After reviewing the Promex concept, Schwindt suggested that electric or pneumatic power were both alternative control options for the proposed Device.

25.    Following the initial meeting, Schwindt constructed a flowchart showing the use of timers and provided the flowchart to Promex. The flowchart described a sequence of operation using pneumatic timers to step the handheld Device through the working cycle.

26.    After receiving Schwindt's chart, Promex shared a prototype fashioned from the housing of a Maglite® metal flashlight. This prototype used an air cylinder and battery-powered electric motor with an offset gear drive that spun an inner cannula.

27.    The Maglite® prototype didn't have a control system to run the Device. Neither Miller nor Mark had substantive experience with either air motors or pneumatic controls. Mark told Schwindt that Promex had no internal organizational capability to design or build such a control system.

5

28.    Schwindt proposed using some form of air drive for the motor instead of the electric motor. Schwindt described the advantages of using an air motor to Mark and Miller. They agreed that a pneumatic (air) design was a superior solution for several reasons: electric components might not have survived the sterilization process; pneumatic components required no connections to wall power and required no battery pack; there was less weight to a pneumatic hand piece; a pneumatic hand piece was usable in a MRI environment; pneumatic operation could be facilitated by bottled dry nitrogen; and a pneumatic concept could have a higher running RPM, higher running torque, and would be easier to get through the Underwriter's Laboratory ("UL") approval process than electric motors.

29.    Schwindt subsequently met with Mark and Miller to discuss the types of air motors that could be used in the Device. At this particular meeting, Schwindt described how piston, turbine, and vane-type air motors worked. Due to RPM requirements and the necessity of compact size, Schwindt recommended use of the vane-type air motor. This conclusion about the air motor was later confirmed by a Rose-Hulman Ventures report.

30.    Schwindt also recommended that the motor be placed in-line with the cylinder and that the motor use the inner cannula as its axle, in contrast to the offset gear drive prototype that Promex had developed.

31.    Promex, Miller or Mark repeatedly expressed budget concerns including comment about the cost of prototypes and controls development.

32.    Schwindt agreed to provide services and expertise in exchange for equity in the invention project, with a goal of Schwindt's ASE company becoming the control console manufacturer for the new Device.

6

33.     Promex subsequently issued purchase orders to ASE memorializing Schwindt's participation along with the cost of certain items that Schwindt and ASE did not have in inventory, the cost of certain items Schwindt and ASE had to purchase, work performed by Schwindt and the cost of certain prototypes built by Schwindt and ASE.

34.     Schwindt then designed and developed a working prototype. Certain components of the prototype used pneumatic parts sold through a company named Parker.

35.     The parts purchased from Parker are generally considered in the industry to be building block logic components, and are often used to create specific pneumatic sequences similar to the use of individual components in the design and development of electrical circuits.

36.     Without input from Promex, Miller or Mark, Schwindt selected the individual logic components and created the desired pneumatic control circuit from those components. Schwindt used an "Anver" vacuum generator and a pneumatic foot switch to power the circuit.

37.     After Schwindt finished building the prototype circuit, Miller and Schwindt tested the system. Thereafter, Schwindt made several additional changes and built another prototype control system on a steel back plate. Miller put the steel back plate prototype into a soft-sided suitcase for portability.

38.     During the summer of 2000, Miller and Schwindt visited Rose-Hulman Institute Ventures in Terre Haute, Indiana and demonstrated the Device concept to some of the engineering professors affiliated with Rose-Hulman Ventures. The professors investigated multiple methods of creating rotary motion and came to the same conclusion as Schwindt: that a vane-type air motor would be most efficient for the Device application.

39.     The professors issued a document memorializing aspects of the conference, testing and findings in a Rose-Hulman Ventures Report.

7

40.     Schwindt ultimately developed a new six-vane air motor design for use in the Device. By the fall of 2000, Miller, Mark and Schwindt collectively agreed that the air motor would have to be designed from scratch.

41.     Because neither Promex nor Schwindt had the equipment to manufacture air motors, Schwindt brought in a local machine shop, JWS Machine, to manufacture the motors. JWS Machine, Miller and Schwindt worked on the design details of the air motor. Eventually, the six-vane design was used to create several prototypes for Miller, which was then installed into the first prototype Devices. Schwindt then shifted focus to design of the control console, which included the pneumatic control circuit.

42.     Due to his knowledge of pneumatics, Schwindt was the controls engineer for the development of the console.

43.     Through Suros, Miller and Mark asked that Schwindt build prototype and production control consoles for the Device. Schwindt included the manifold concept referenced in paragraphs 57 and 58 below and built the consoles.

44.     During this console development phase, Miller and Mark were using nitrogen to power the air motor, cylinder, controls, and vacuum generator. This particular arrangement was having problems during testing. Schwindt suggested that another form of compressed gas would be needed and that a compressor could be housed in a suitcase. Schwindt was the sole inventor of the compressor solution to the compressed gas problem. He proceeded to build the compressor into a suitcase type enclosure.

45.     He also devised a solution for regulating the gas pressure, muffling the noise from the compressor, contained the heat and moisture that was generated by the compression process and addressed a significant condensation problem accumulating within the console enclosure.

8

46.     Using a heat exchanger and fan combination, Schwindt was able to stabilize the heat generated by the compressor within the enclosure.

47.     He also designed the pressure control system and incorporated a relief regulator, which exhausted excess pressure out of the cabinet when the system was idling. Experimenting with mufflers on the exhaust, Schwindt discovered that water vapor being collected by the coalescing filter turned to liquid and could be evaporated through a uniquely positioned filter that was used as a muffler, rather than its intended purpose as a filter. This ended up being a significant contribution to the circuit, since the alternative was to have a collection bottle for the fluid, or to have the fluid just drip inside the console. Moreover, the evaporation system conceived by Schwindt was effective at a nominal cost compared to alternatives.

48.     This whole console concept was captured in U.S. Patent Application No. 10/420,296 which was recently allowed in 2008 as Patent No. 7,316,726 naming Schwindt as the sole inventor (the '726 Patent).

49.     As part of his further contribution to the Device, Schwindt developed and provided control and circuit drawings for use in the production and manufacturing process.

50.     Some of the processes, controls or circuits depicted on the draft drawings lacked proper descriptive art. Engineering symbols couldn't be found to adequately communicate or describe the process. Schwindt therefore adapted symbols for the application and created his own master Symbol Library (the "Symbol Library"). Schwindt annotated the Device circuit drawings with some of the symbols from his Symbol Library.

51.     When Schwindt subsequently drew the production and manufacturing Device circuit diagrams, he used symbols from his Symbol Library. Prior to the events described here, Schwindt's Symbol Library was not published anywhere. Schwindt used the Symbol Library to

9

illustrate parts of a circuit that may not have otherwise had a symbol expressing or describing their functions for the subject applications.

52.    Another significant feature Schwindt implemented was to substitute a pressure switch for the cutter extend timer. Substitution of the pressure switch allowed for closed loop monitoring of the end of stroke for the cutter cylinder. The pressure switch used was an AIRTROL® product, for which Schwindt's company was a distributor.

53.    As Schwindt was not aware of a commonly accepted symbol for a pneumatic output pressure switch, he also adapted and used a symbol from his Symbol Library.

54.    A similar process was followed with respect to an electric (versus pneumatic) output pressure switch. Although an industry standard drawing symbol did exist for depicting an electric switch, Schwindt used his own version from his Symbol Library in the drawings provided.

55.    Also during this phase of development, Schwindt determined that a pneumatically operated pinch valve was needed to start and stop saline and vacuum flows. Mark provided a sample of an ASCO electric pinch valve that could be used as a concept. Schwindt proceeded to develop the pneumatic version of the valve. He contacted JWS Machine and built prototypes. No one from Promex or Suros was involved in this part of the development.

56.    The finalized pinch valve concept was shown to Miller and Mark and they agreed that it was an important concept to incorporate into the control console.

57.    As yet another contribution to the Device, for an alternative to the Parker logic controls referenced in paragraph 43, Schwindt suggested using a pneumatic circuit manifold. The pneumatic circuit manifold concept would be far superior from both cost and functional aspects (*i.e.* if it incorporated pneumatic logic rather than the Parker logic).

10

58.     Schwindt designed and built two prototype manifolds. In the manifold prototypes Schwindt created the pneumatic equivalent of a silicon chip, which has a significant portion of its wiring embedded in the chip. Doing this with a pneumatic circuit was commercially advantageous as well as novel, given that this manifold had not been previously built and was unique to this application.

59.     In or about the third quarter of 2000, Schwindt asked Miller about applying for patent protection for the pneumatic controls, circuits, pinch valve, air motor, console and related concepts for the Device. Miller diverted Schwindt's attention and falsely told Schwindt that the controls, circuits, console and related concepts could not be patented.

60.     Schwindt later learned that his contributions as inventor could be patented and at the time of the above conversation, Miller and Mark had already submitted a patent application based upon the subject technology.

61.     Unknown to Schwindt, Miller and Mark already started taking Schwindt's Inventions and incorporated the drawings, designs, process and ideas into their own patent applications that failed to provide Schwindt with either consideration or recognition as one of the inventors.

62.     Schwindt later learned that Miller and Mark filed United States Patent Application No. 09/707,022 (the '022 Application) naming Miller, Mark and others as inventors. Although Schwindt was a significant contributor, he was omitted as a joint inventor by Miller and Mark. Schwindt should be included as a joint inventor.

63.     The '022 Application eventually resulted in U.S. Patent No. 6,758,824 (the '824 Patent) being issued for the Device. The '824 Patent in turn is the parent of U.S. Patent No. 6,638,235 (the '235 Patent) and others that rely upon Schwindt's drawings, designs, process and

ideas. The '235 Patent also is a continuation in part of the '022 Application. Portions of the '824 Patent and the '235 Patent are attached as Exhibits 1 and 2 respectively for reference.

64.    Sometime prior to filing the '022 Application in 2000, Miller and Mark ostensibly assigned the property interests to Suros.

65.    In about June, 2001, Miller and Mark sought venture capital for Suros. Schwindt purchased $50,000 of Series B Suros stock on June 30, 2001.

66.    Parallel to the capital raise, clinical trials of the Device were occurring.  From the trials, Schwindt observed certain modifications that could further improve the Device and systems. One such observation was that the Device and system needed more vacuum flow. Improvement was made by the addition of a vacuum pump and Schwindt was involved in those modifications.

67.    In or about this period of testing and development, Schwindt asked Mark if an existing verbal agreement with Mark, Miller and Promex should be reduced to writing with Suros. Mark agreed that a written agreement may be appropriate and suggested involving Jim Pearson, then the President of Suros. Work began on drafts of such a document and a review meeting ultimately occurred.

68.    Present at the meeting was Miller, Mark, Schwindt and legal counsel for the respective parties. At the meeting, attorneys for Suros claimed that all intellectual property belonged to Suros. After the meeting became confrontational, Miller admitted that he had nothing to do with the pneumatic circuit designs contributed by Schwindt and the dynamic changed to a more cordial atmosphere. Unknown to Schwindt, and the admission by Miller notwithstanding, Mark and Miller were already many months into the '022 Application process hiding Schwindt's contributions and property ownership.

12

69.     Rather than a written agreement occurring, negotiations completely broke down. Schwindt was told by both Jim Pearson and Mark that discussions were not doing him any long term good. The existing contracts and relationship with Suros, Miller and Mark was specifically threatened. Schwindt capitulated to the threats and continued working with Suros, Miller and Mark.

70.     Device console orders continued to grow from Suros, Miller and Mark. Schwindt and ASE became increasingly dependent upon Miller and Mark's good faith and good will for business. Schwindt and ASE became the warehouse for Suros and began shipping finished goods direct to Suros customers. Schwindt was provided with the Suros customer list to assist with efficient operation of the agreement between Suros, Schwindt and ASE.

71.     Planned production for the Device consoles was 20 units per month. In Spring, 2004, a sudden shift occurred with Suros requesting production of 100 units in three months. Schwindt and ASE accommodated the request. During this period, the relationship with Suros represented approximately 50% of the business for Schwindt and ASE.

72.     Schwindt ultimately discovered the '824 Patent had been issued.

73.     On September 8, 2004, Schwindt filed Application No. 10/936,395 (the '395 Application) naming Schwindt, Miller, Mark, John Hancock and Charles Butcher as inventors in an attempt to correct Miller and Mark's conduct relating to the '824 Patent. A copy of the '395 Application is attached as Exhibit 3 for reference.

74.     The '395 Application also included a request for interference against Miller and Mark. This other '395 litigation remains pending before the U.S. Patent Office and Trademark Office (the "USPTO").

13

75.     In an Office Action letter mailed in October, 2009, the USPTO suggested that it is the district court and not the Office that is in the best position to fashion an equitable remedy to fit the facts in cases [such as this one] where inequitable conduct is established. The Office cited the Manual of Patent Examining Procedure section 2010.

76.     After filing the '395 Application, Suros stopped doing business with ASE. However, Miller and Mark continued constructing the scheme against Schwindt.

77.     Miller and Mark began to take additional steps to injure Schwindt and profit from the injury. As founders of Suros, either personally or through trusts, stock limited partnerships or other voting arrangements, Miller and Mark were the largest stockholders of Suros, in addition to being members of senior management.

78.     With their controlling roles at Suros, Miller and Mark influenced and directed Suros to consider strategic merger or purchase alternatives.

79.     Suros management had preliminary discussions with prospective buyers over the course of 2004 and 2005, one of whom was Hologic.

80.     In or about February, 2006, Suros and Hologic entered into a letter agreement setting forth general terms of a purchase offer.

81.     Before the purchase was consummated, Miller and Mark first secured multiple year employment agreements from Suros for themselves. One of the terms of the employment agreements was an "assignment of inventions" provision to Suros.

82.     Technology and property that was transferred to Suros by Miller and Mark included the Schwindt technology and Inventions, an example of which is reflected in the '824 Patent.

14

83.     Miller and Mark didn't own the Schwindt technology or Inventions. Any attempted assignment by them was false, deceptive and fraudulent.

84.     Suros entered into a Merger Agreement with Hologic to buy Suros. A significant portion of the Merger Agreement consideration included the Inventions taken from Schwindt.

85.     One of the pre-conditions of the Merger Agreement was that the two largest shareholders vote to approve the merger through a voting agreement. Either directly or as beneficiaries, Miller and Mark were the two largest shareholders.

86.     On or about April 17, 2006, Miller and Mark either executed the voting agreement, or caused the voting agreement to be executed on their behalf.

87.     In the Merger Agreement, Miller and Mark allowed or directed Suros to represent that Suros "owns all right, title and interest to each of the Patents and, to the knowledge of the Company, owns all right, title and interest in and to all other material Intellectual Property Assets … Except as set forth on Section 2.20 of the Company Disclosure Schedule … the operation of the business of the Company as heretofore conducted and as presently conducted, does not (and did not at any time) infringe or misappropriate any intellectual property rights or trade secrets of any other Person."

88.     That representation about owning all patents and intellectual property was false and deceptive and continues to be false and deceptive. Among other reasons, Miller and Mark knew the statement was false due to the pending '395 patent application attempting to correct their conduct.

89.     Miller, Mark and Suros did not own all right, title or interest in the Schwindt Inventions that were taken by Miller and Mark and assigned to Suros. Miller, Mark and Suros were and are infringing upon and misappropriating Schwindt's Inventions and property rights.

15

90.     On or about July 24, 2006, a special meeting of the stockholders was held to approve the Merger Agreement. At the meeting or shortly thereafter, the Merger Agreement was approved with Miller and Mark adhering to the voting agreement as the largest shareholders (directly or as beneficiaries).

91.     According to the Merger Agreement, subject to adjustment, shareholders received at least $240 million, consisting of $132 million in cash at closing and $108 million payable at closing in cash or Hologic shares. Also according to the Merger Agreement, there were up to two additional deferred cash payments based upon revenues from sales of Suros products and services during the two years after the closing.

92.     After the Merger approval, closing occurred in 2006 with Miller and Mark receiving their proportionate share believed to be in excess of $50 million, either directly or as beneficial payment. Two additional deferred cash payments were also made for subsequent sales of the products. A substantial portion of the cash payments received by Miller and Mark in 2006, 2007 and 2008 was consideration for the Inventions taken from Schwindt.

93.     As reflected in the '824 Patent, Schwindt was either the inventor or a joint inventor of claims 1, 34, 35 and 37.

94.     Most importantly, the Device doesn't function in the commercial production market without Schwindt's contributions.

95.     Figures 10 and 11 of the '824 Patent are Schwindt's drawings and contain portions of his proprietary Symbol Library.

96.     Schwindt was the first to reduce the claimed invention to practice.

97.     Schwindt's contributions enabled the invention as reflected in the '824 Patent and subsequent patents relying upon the '824 in whole or in part.

16

98.     Appropriating Schwindt's Inventions in the '824 Patent process served as an early piece of a continuing scheme. For example, U.S. Patent No. 7,497,833 issued on March 3, 2009 is a continuation in part of the '022 Application that ultimately became the '824 Patent. With the exception of one additional blow up of detail, the drawings that serve as the foundation of both patents are identical. Portions of the '833 Patent are attached as Exhibit 4 for reference.

99.     For further example, comparing Patent Application 10/970,269 published on February 1, 2007 to the '824 Patent (other than possible font changes), the drawings depicting the Device continue to be copied without attribution to Schwindt.

100.     In addition to the false statements and misrepresentations submitted to the Patent Office by Miller and Mark with respect to the '824 Patent, Miller and Mark continue to file bad faith, false statements and misrepresentations attempting to challenge Schwindt's current '395 Application. In both 2004 and 2005, Miller and Mark submitted virtually identical false affidavits to the USPTO and among other misrepresentations said that Schwindt "did not invent the biopsy device nor did he invent any procedures for operating the device."

101.     In another example of Miller and Mark's incongruent conduct, when the Patent Office issued Miller's '833 Patent in 2009, Schwindt's 2008 '726 Patent was cited, while Miller and Mark during the same periods of time continued presenting false statements challenging Schwindt's contributions as inventor or joint inventor.

102.     At all times relevant, 35 U.S.C. § 101 stated that: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

103.     At all times relevant, 35 U.S.C. §§ 115 and 116 were in full force and effect. In an

17

application or petition to the United States Patent Office, Section 115 requires attestation from the inventor that "that he believes himself to be the original and first inventor of the process, machine, manufacture, or composition of matter, or improvement thereof, for which he solicits a patent." Section 116 requires that "When an invention is made by two or more persons jointly, they shall apply for patent jointly and each make the required oath, except as otherwise provided in this title."

104. At all times relevant, 35 U.S.C. § 261 stated that patents shall have the attributes of personal property.

105. At all times relevant, 37 CFR. § 1.56 imposed a duty of disclosure, good faith and candor upon Miller and Mark. Such duty included full disclosure of Schwindt's inventorship in the '824 Patent and all subsequent or related applications or patents referring or relying upon Schwindt's Inventions in whole or in part.

106. At all times relevant, Schwindt entrusted his work product and Inventions to Miller and Mark in the belief and with the understanding that it was confidential. Schwindt also relied upon Defendants' representations that his Inventions and work product were used or being used for mutual benefit.

107. Miller and Mark intentionally and fraudulently concealed and omitted Schwindt as an inventor of the '824 Patent and subsequent patents that rely upon or are continuations in whole or in part of the '824 Patent, including the '235 Patent issued in 2003 and the '833 Patent issued in 2009. In each instance, Miller and Mark submitted false statements and false oaths inducing patents and other tangible and intangible property belonging to Schwindt to be issued to Miller and Mark. They established a pattern of false, deceptive and fraudulent conduct described above and below that continues to date.

18

108.    Miller and Mark used the Schwindt Inventions to engage in the described acts of fraud and deceptive conduct in their dealings with Suros and U.S. Patent Office applications, communications and issuance of patents.

109.    Through their ownership, management and control of Suros, using false statements, threats, intimidation, deception and misrepresentations, Miller and Mark diverted attention from their Suros enterprise and scheme to use Schwindt's Inventions for their own purposes and profit.

110.    In or about June, 2000, Miller and Mark created a separate enterprise in Suros Surgical Systems, Inc. They then attempted to convert, assign or transfer Schwindt's Inventions to Suros that were obtained under false oath or pretense in the '022 Application and the '824 Patent. The attempted conversion, assignment or transfer of Schwindt's property was done either personally by Mark and Miller or through one or more of the Promex or Suros assumed names. The conversion, assignment, transfer, or interference with Schwindt's Inventions continues to date.

111.    As a direct and proximate result of Defendants' actions, Schwindt suffered injury and damage when Miller and Mark received payment for Schwindt's Inventions from the Merger Agreement and other sources. Schwindt received no consideration from the payments made to Miller and Mark for the property assigned to Suros. The injury and damage continues to date.

112.    Being deprived of his Inventions and the corresponding money taken by Miller and Mark, Schwindt was forced to file personal bankruptcy in 2010. As a term of the bankruptcy Schwindt was required to assign 50% of certain proceeds from the present claim to the Trustee and the estate. An order approving the assignment and settlement was entered on December 10, 2010.

19

## COUNT I
## DECLARATORY JUDGMENT

113.    Paragraphs 1 through 112 are incorporated by reference in this Count I as though fully set forth.

114.    At all times relevant, 28 U.S.C. § 2201 provided for a declaratory judgment in the case of actual controversy within the court's jurisdiction.

115.    This claim is also made under the provisions of the patent laws of the United States, 35 U.S.C. §§ 101, *et seq.*

116.    Schwindt is a joint inventor and co-owner of the '824 Patent and the '395 Application, the claimed inventions of which were conceived in part by Schwindt and entrusted to Miller and Mark in confidence.

117.    Schwindt isn't listed as an inventor or joint inventor of the '824 Patent.

118.    Failure to name Schwindt as a joint inventor in the '824 Patent occurred without deceptive intent on Schwindt's part under 35 U.S.C. § 256.

119.    An actual controversy exists between Schwindt, Miller and Mark requiring a declaration of the rights and legal relations between them with respect to Schwindt's inventorship of the Device, device console, the attempted assignment of Schwindt's Inventions, revenue, damages, costs, expenses and fees arising from use of Schwindt's Inventions.

WHEREFORE, Plaintiff prays that a judgment be entered in his favor and against Defendants as follows:

  a)  Declaring Plaintiff as a joint inventor of the '824 Patent;
  b)  Declaring any and all attempted and improper assignments of Plaintiff's Inventions or property void;
  c)  Reforming any and all assignments or attempted assignments of Plaintiff's Inventions;

d) Reforming any and all documents or contracts necessary to properly recognize Plaintiff's Inventions;

e) Accounting for any and all actual or attempted assignments of Plaintiff's Inventions by Defendants to Promex, Suros, Hologic or any other person or entity at any time;

f) Accounting for any and all payment or consideration of any kind offered or received by Defendants from any source including, but not limited to, money, gifts, donations, stock, ownership interests, voting rights, options, beneficial interests, powers of direction, powers of appointment, trusts, trustee appointments, contracts, agreements, claims or partnerships;

g) For full restitution of a *pro rata* share of all money or other consideration of any kind received by Defendants in whole or in part from use or conversion of Plaintiff's Inventions and including prejudgment interest;

h) For costs and attorneys fees; and

i) For such other or different relief as the Court deems equitable or appropriate under the circumstances.

## COUNT II
## STATUTORY FRAUD, DECEPTION AND MISREPRESENTATION

120.    Paragraphs 1 through 112 are incorporated by reference in this Count II as though fully set forth.

121.    At all times relevant, Indiana Code § 35-43-5-3 was in full force and effect and in part stated as follows:

(a)    A person who: ... (2) knowingly or intentionally makes a false or misleading written statement with intent to obtain property ... (3) misapplies entrusted property ... in a manner that the person knows is unlawful or that the person knows involves substantial risk of loss or detriment to either the owner of the property or to a person for whose benefit the property was entrusted; ... (6) with intent to defraud, misrepresents the identity of the person or another person or the identity or quality of property; ... commits deception, a Class A misdemeanor.

122.    At all times relevant, Indiana Code § 35-43-1-2 was in full force and effect and in part stated as follows: (a) A person who: ... (2) knowingly or intentionally causes another to suffer pecuniary loss by deception ...commits criminal mischief, a Class B misdemeanor.

123.    At all times relevant, Indiana Code  § 34-24-3-1  was in full force and effect and in part stated as follows: If a person suffers a pecuniary loss as a result of a violation of IC 35-43,

21

IC 35-42-3-3, IC 35-42-3-4, or IC 35-45-9, the person may bring a civil action against the person who caused the loss for the following: (1) An amount not to exceed three (3) times the actual damages of the person suffering the loss. (2) The costs of the action. (3) A reasonable attorney's fee ... (7) All other reasonable costs of collection.

124.    Defendants knowingly or intentionally: made false, misleading written statements with intent to obtain property; misapplied entrusted property knowing it to be unlawful or with knowledge of substantial risk of loss or detriment to the owner or beneficiary; with intent to defraud, misrepresented the identity of another person's property; or caused another person to suffer pecuniary loss by deception in one or more of the following ways. Each of the Defendants:

a) Failed to name Plaintiff as a joint inventor of the '824 Patent;
b) Falsely represented to Plaintiff that his inventorship contributions and Inventions could not be patented;
c) Falsely represented to the USPTO and Plaintiff that Defendants (and others) were the only inventors for the '824 Patent intending to obtain Plaintiff's property;
d) Deceived the USPTO and Plaintiff that Defendants (and others) were the only inventors for the '824 Patent;
e) Submitted false, deceptive and misleading written documents to the USPTO;
f) Breached the duty of good faith, candor and full disclosure to the USPTO and Plaintiff;
g) To Plaintiff's detriment, misapplied his property that was entrusted to Defendants;
h) To Plaintiff's detriment, misapplied his property that was entrusted to Defendants by assigning or attempting to assign the Inventions to Promex, Suros or Hologic;
i) Falsely represented, misrepresented and deceived Suros and Hologic that Defendants owned all right, title and interest to each of the Patents;
j) Falsely represented, misrepresented and deceived Suros and Hologic that Defendants owned all right, title and interest in and to all other material Intellectual Property Assets;
k) Falsely represented, misrepresented and deceived Suros and Hologic that Defendants conducted their business so as to avoid infringing or misappropriating any intellectual property rights or trade secrets of any other Person at any time; and
l) Falsely represented, misrepresented and deceptively held out Plaintiff's inventorship and Inventions as their own.

125.    As a direct and proximate result of Defendants' violations of Indiana Code sections 35-43-5-3 and 35-43-1-2, Plaintiff suffered pecuniary damages in an amount believed to be in excess of $10,000,000.

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against Defendants jointly and severally as follows:

   a)  For actual damages in an amount to be determined in excess of $10 million;
   b)  For the statutory multiplier of three times the actual damages;
   c)  For costs and attorneys fees;
   d)  For all other reasonable costs of collection; and
   e)  For such other or different relied as the Court deems appropriate under the circumstances.

## COUNT III
## UNJUST ENRICHMENT

126.    Paragraphs 1 through 112 are incorporated by reference in this Count III as though fully set forth.

127.    Defendants appropriated Schwindt's Inventions and confidential information as their own at the expense and to the exclusion of Plaintiff.

128.    As a direct and proximate result of their improper actions, Defendants have been unjustly enriched, having received the benefit of Plaintiff's contributions without compensation to Plaintiff.

129.    Defendants were aware of, and had knowledge of, the benefits conferred upon them by their use of Plaintiff's Inventions and confidential information.

130.    Under the circumstances described, Defendants' receipt and retention of any monetary or other benefits conferred for the use of Plaintiff's Inventions or confidential information would be unjust.

23

131.    Plaintiff is entitled to disgorgement and restitution of all economic benefits which

Defendants derived for the use of Plaintiff's Inventions and confidential information.

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against

Defendants jointly and severally as follows:

a) For full restitution in an amount to be determined in excess of $10 million;
b) For costs and attorneys fees;
c) For prejudgment interest; and
d) For such other or different relief as the Court deems equitable or appropriate under the circumstances.

## COUNT IV
## ACCOUNTING

132.    Paragraphs 1 through 112 are incorporated by reference in this Count IV as

though fully set forth.

133.    As described above, using Schwindt's Inventions and confidential information in

whole or in part, Miller and Mark were granted the '824 Patent without credit or compensation to

Schwindt.

134.    Miller and Mark received and are receiving significant money and other

consideration from their conduct.

135.    Schwindt is entitled to an accounting of any monetary or other benefits or

consideration received by Miller and Mark related to the use or reliance upon Schwindt's

Inventions or confidential information.

136.    An accounting is necessary so that Plaintiff may be properly paid any money or

other consideration rightfully belonging to him.

WHEREFORE, Plaintiff prays that a judgment be entered in his favor and against Defendants as follows:

a) Accounting for any and all actual or attempted assignments of Plaintiff's Inventions by Defendants to Promex, Suros, Hologic or any other person or entity at any time;

b) Accounting for any and all payment or consideration of any kind offered or received by Defendants from any source including, but not limited to, money, gifts, donations, stock, ownership interests, voting rights, options, beneficial interests, powers of direction, powers of appointment, trusts, trustee appointments, contracts, agreements, claims or partnerships;

c) For full restitution of all money or other consideration of any kind received by Defendants in whole or in part from use or conversion of Plaintiff's Inventions in an amount to be determined in excess of $10 million;

d) For costs and attorneys fees;

e) For prejudgment interest; and

f) For such other or different relief as the Court deems equitable or appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff requests that all appropriate issues be determined by a jury.

Dated:     January 19, 2011

Respectfully submitted,
PLAINTIFF,

By: _____
One of his Attorneys

Atty. No. 6197713
Steve C. Silvey
ATHENA ATTORNEYS AT LAW, LLC
688 Lee Street
Des Plaines, IL 60016
(847) 298-8020

25